## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LINDSAY DILL, individually and on behalf of all others similarly situated, | **No.** |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| PALMCO ENERGY MA, LLC; PALMCO POWER MA LLC; ROBERT PALMESE; and COLUMBIA UTILITIES HEATING CORP., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Lindsay Dill ("Plaintiff"), on behalf of herself and all persons similarly situated, by and through her attorneys, alleges as follows:

### INTRODUCTION

1.    Plaintiff brings this action on behalf of herself and a class of all similarly situated customers in Massachusetts against Defendants PALMco Energy MA LLC; PALMco Power MA LLC; Robert Palmese; and Columbia Utilities Heating Corporation (collectively "Defendants" or "PALMco"), arising out of PALMco's improper billing practices for "supplying" electricity to residential consumers.

2.    PALMco entices residential customers to sign up for its service by offering seemingly low initial rates for electricity.  When the "teaser rate" period expires, however, customers are rolled over into a month-to-month variable rate plan with exorbitant rates.

3.    PALMco's "Variable Rate" electricity plan to residential consumers is tied to the market rate in the wholesale power market.  However, contrary to PALMco's representations and obligations, PALMco consistently and improperly charges an extraordinarily high premium

rate for electricity *regardless* of fluctuations in the underlying market price.  Indeed, as set forth below, PALMco routinely charges its consumers up to almost ***three times*** the underlying market rate, notwithstanding PALMco's representations that its variable rates will be based on "prevailing market conditions."  Specifically, even when the market price goes *down,* PALMco's rate remains at an inflated level several times higher than the market rate.  Thus, PALMco's Variable Rate is not based on market conditions, as promised.

4.      PALMco's improper scheme of charging inflated electric prices that match *increases* in the underlying market price while failing to pass along corresponding *decreases* is intentionally designed to maximize revenue for PALMco.  Consumers, such as Plaintiff and the Class, were deceived into believing that PALMco will provide market-based rates when, in reality, PALMco sets its prices at significantly above-market rates and PALMco's competitors' rates.

5.      Plaintiff and other PALMco customers have been injured by PALMco's unlawful practices.  Accordingly, Plaintiff, on behalf of herself and the Class, seeks damages, restitution and injunctive relief for PALMco's breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), and unjust enrichment (Count III).

## PARTIES

6.      Plaintiff Lindsay Dill is a resident and citizen of Dedham, Massachusetts.

7.      Defendant PALMco Energy MA LLC is a Massachusetts limited liability company whose principal place of business is located at 8751 18th Avenue, Brooklyn, NY 11214.

8.      Defendant PALMco Power MA LLC is a Massachusetts limited liability company whose principal place of business is located at 8751 18th Avenue, Brooklyn, NY 11214.

9.      Defendant Robert Palmese is an individual, and an officer, owner, member, director, and/or employee of each of the PALMco LLC defendants listed above. Upon information and belief, his primary residence is located in Brooklyn, New York. His primary place of business is located at 8751 18th Avenue, Brooklyn, NY 11214.

10.     Columbia Utilities Heating Corporation is a New York corporation whose principal place of business and head office are both located at 8751 18th Avenue, Brooklyn, NY 11214. Upon information and belief, Defendant Robert Palmese is the current President of Columbia Utilities Heating Corporation.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction of the claims asserted herein pursuant to 28 U.S.C. § 1332(d)(2)(A) in that the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interest and costs, and is a class action with more than 100 putative members, and in which there is the requisite minimal diversity, i.e., members of the putative plaintiff class (the "Class Members" or "Class") are citizens of states different from Defendants.

12.     This Court has general personal jurisdiction over Defendants. Defendants do business in Massachusetts through continuous, permanent, and substantial activity in Massachusetts.

13.     This Court has specific personal jurisdiction over Defendants because they maintain sufficient contacts in this jurisdiction, including the advertising, marketing, distribution and sale of electricity to Massachusetts consumers.

8.      Venue is proper pursuant to 15 U.S.C. § 80b-14 and 28 U.S.C. § 1391. Defendants regularly transact and solicit business in this District, and Plaintiff resides in this District.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### A.    Energy Deregulation and the Role of Competitive Electric Suppliers

9.      In the late 1990s and early 2000s, many states moved to deregulate parts of the electricity supply services performed by large public utilities. Delivery of electricity to a consumer requires both the creation of electricity and the transmission of that electricity from the power plant to the consumer. The typical pattern was to require the public utilities to divest their power generation assets such as coal, gas and nuclear power plants. However, the regulated utilities continued distributing power from these power plants to consumers through transmission lines.

10.     When deregulation occurred, the business of power *supply* was opened to competition and consumers were allowed to select the companies from whom they would purchase their power. However, states generally set a "standard offer" (also sometimes called a "default rate") available to all customers in each public utility's service area. Massachusetts has both a fixed rate standard offer and a variable rate standard offer. The fixed rate remains constant, whereas the variable rate fluctuates each month based upon certain factors.

11.     As a result of the deregulation of power supply, several different parties are now involved in the supply of electric power to residential consumers. Certain companies, such as Dominion, produce electric power ("Generation Companies"). Other companies, such as Eversource in Massachusetts, distribute electricity from Generation Companies to end users ("Distribution Companies"). Although some Generation Companies have sold

power directly to consumers, including residential customers, most sell the power on the wholesale market to companies that market to retail customers. These companies are called Competitive Electric Suppliers ("CESs"). Defendant, PALMco, is one such CES.

12. The market for wholesale power in New England is administered by an independent, not-for-profit corporation formed in accordance with the recommendations of the Federal Energy Regulatory Commission, called ISO New England (for "Independent System Operator"). ISO New England coordinates and directs the generation and flow of electricity throughout the region, ensuring that electric supply exactly meets demand throughout the network. The wholesale market managed by ISO New England determines whether and when electricity will be made by Generation Companies and the wholesale prices that will be paid for that electricity through competitive bids. "More than 500 companies participate in these markets, buying and selling between \$6-\$14 billion of electric power and related products annually."[1] The bid process determines the Generation Company that will make each unit of electricity and the wholesale price each CES will pay to each Generator for each unit of energy delivered to specific locations throughout the region.

13. CESs, including PALMco, play a middleman role: they purchase power directly or indirectly from Generation Companies and sell that electricity to end-user consumers. However, CESs do not *deliver* that electricity to consumers. Rather, Generation Companies deliver the electricity to Distribution Companies, which in turn deliver the electricity to the ultimate consumer. CESs merely buy electricity at the wholesale rate, then sell that power to end-users with a mark-up. Thus, CESs are essentially brokers and traders.

---

[1] *See* https://www.iso-ne.com/about/what-we-do/three-roles/administering-markets (last accessed April 11, 2019).

They neither make nor deliver electricity, but merely buy electricity from the Generation Companies and re-sell it to end users.

14.    Like other CESs, PALMco purchases power on the wholesale market and sells it to consumers.  The New England power grid receives power from a variety of power plants and transmits that power throughout New England as needed.  PALMco buys and resells power purchased from the New England regional electricity market.

15.    PALMco's prices do not have to be—and are not in fact—approved by states' regulatory authorities such as the Massachusetts Department of Public Utilities.  Rather, PALMco and other CESs are free to set their own rates for supplying electricity to consumers.  And PALMco, like all other suppliers, relies upon the Distribution Companies to deliver the electricity it purchases on the wholesale market to its customers. The Distribution Companies charge separately for their services, using rates that must be reviewed and approved by the states' regulatory agencies.

16.    CESs may contract with consumers to supply electricity on either a "Fixed" or "Variable" rate basis.  Under a Fixed contract, the Supplier agrees to supply electricity at a set rate for a certain number of months.

17.    Under a Variable rate contract, the Supplier may vary the rate it charges on a periodic basis (often monthly).

18.    PALMco offers various Fixed and Variable rate plans, including contracts that charge a low promotional "teaser" rate which is fixed for a set number of months before automatically rolling into a Variable Rate plan.

**B.     The Failure of Energy Deregulation and Resulting Harm to Consumers**

19.     Almost all states that deregulated their energy markets did so in the mid- to late-1990s.  This wave of deregulation was frantically pushed by then-corporate behemoth Enron. For example, in December 1996 when energy deregulation was being considered in Connecticut, "the most aggressive proponent" of deregulation, Enron CEO Jeffrey Skilling said:

> Every day we delay [deregulation], we're costing consumers a lot of money . . . . It can be done quickly.  The key is to get the legislation done fast.[2]

20.     Changing the industry under this sense of urgency and with inadequate protections against abuse has resulted in consumers in the states that deregulated suffering serious harm.  For example, by 2001, forty-two states started the deregulation process or were considering deregulation.  Today, the number of full or partially deregulated states has dwindled to only seventeen and the District of Columbia.  Even within those states, several have recognized deregulation's potential harm to everyday consumers and now only allow large-scale consumers to shop for their energy supplier.

21.     Responding to shocking energy prices often paid by ordinary consumers, many key players that supported deregulation now regret the role they played.  For example, reflecting on Maryland's failed deregulation experience, a Maryland Senator commented: "Deregulation has failed.  We are not going to give up on re-regulation till it is done."[3]

22.     A Connecticut leader who participated in that state's foray into energy deregulation was similarly regretful:

---

[2] Christopher Keating, Eight Years Later . . . "Deregulation Failed" HARTFORD COURANT, Jan. 21, 2007.
[3] David Hill, State Legislators Say Utility Deregulation Has Failed in its Goals, THE WASHINGTON TIMES, May 4, 2011.

> Probably six out of the 187 legislators understood it at the time, because it is so incredibly complex . . . . If somebody says, no, we didn't screw up, then I don't know what world we are living in. We did.[4]

23.     Deregulation in Massachusetts began in 1997, but the goals of deregulation – "promot[ing] the prosperity and general welfare of its citizens . . . by restructuring the electricity industry in the commonwealth to foster competition and promote reduced electricity rates" (see Ch. 164 of the Acts of 1997, Sec. 1.) – have not been achieved.

24.     Massachusetts Attorney General, Maura Healey, has expressed serious concerns about the improper practices of Competitive Electric Suppliers, like PALMco, who operate in the Commonwealth of Massachusetts.

25.     In March 2018, Attorney General Healey issued a report calling for an end to the competitive electricity supply market for individual residential customers in Massachusetts.[5] According to the report, "Massachusetts electric customers who switched to a competitive electric supplier paid $176.8 million more than if they had stayed with their utility company during the two-year period from July 2015 to June 2017."[6]

26.     Attorney General Healey implicitly recognized the false promises made by competitive electric suppliers like PALMco: "Competitive electric suppliers promise big energy savings but are actually burdening customers with hundreds of dollars in extra costs."[7]

---

[4] Keating, supra note 5.
[5] See Press Release, Office of Attorney General Maura Healey, AG Healey Calls for Shut Down of Individual Residential Competitive Supply Industry to Protect Electric Customers (March 29, 2018), https://www.mass.gov/news/ag-healey-calls-for-shut-down-of-individual-residential-competitive-supply-industry-to-protect.
[6] See Report, Massachusetts Attorney General's Office Commonwealth of Massachusetts, An Analysis of the Individual Residential Electric Supply Market in Massachusetts (March 2018), https://www.mass.gov/files/documents/2018/03/29/Comp%20Supply%20Report%20Final%20032918.pdf, at viii.
[7] See Press Release, https://www.mass.gov/news/ag-healey-calls-for-shut-down-of-individual-residential-competitive-supply-industry-to-protect.

27.    Energy deregulation in Massachusetts has been an abject failure.  As discussed in the report, "Massachusetts consumers in the competitive supply market paid **$176.8 million more** than they would have paid if they had received electric supply from their electric company during the two-year period from July 2015 to June 2017."[8] (emphasis in the original).  Moreover, the total net consumer loss from participation in the Individual Residential Electric Supply Market compared to the Electric Company's Basic Service was $65.4 million dollars from July 2015 to June 2016.  From July 2016 to June 2017, the total net consumer loss increased to $111.4 million dollars, which leads to a $176.8 million-dollar total net loss in two years."[9]

28.    Concluding that energy deregulation has resulted in considerable consumer harm in Massachusetts, Attorney General Healey "strongly" recommended that the legislature put an end to it:

> I find that the individual residential market for electric supply causes significant net harm to Massachusetts consumers, and I strongly recommend that the Legislature end the individual residential market for electric supply.[10]

29.    In May 2016, the New Jersey Attorney General's Office, the New Jersey Board of Public Utilities, and the Division settled a lawsuit against PALMco for deceptively advertising and selling gas and electric service in New Jersey.[11]  The lawsuit alleged that PALMco failed to provide competitive energy rates, rates that were lower than the utility companies, or rates that were consistent with pricing mechanisms in its contracts.[12]

---

[8] Report, https://www.mass.gov/files/documents/2018/03/29/Comp%20Supply%20Report%20Final%20032918.pdf at viii.
[9] Id. at Appendix 5A, p. 1.
[10] Id. at 40.
[11] *See* https://www.njconsumeraffairs.gov/Palmco.
[12] *Id*.

30.    Similarly, in August 2017, the Connecticut Attorney General's Office reached a settlement with PALMco for the company's deceptive practices and overcharging consumers on their electricity bills.[13]

31.    And in March 2017, Illinois Attorney General Lisa Madigan filed a lawsuit against PALMco for misleading customers about the true cost of switching their electricity supply from their local utilities.[14]  According to Attorney General Madigan, "Palmco deceived electric customers into switching their provider and paying much more than they should have . . . Palmco needs to be held accountable for violating the law by misleading people about the true cost of their electricity."[15]

32.    According to the Columbus [Ohio] Dispatch, in the past two weeks Ohio regulators, upon recommendation of Public Utilities Commission of Ohio ("PUCO"), have initiated an investigation against PALMco's deceptive billing, misleading and deceptive practices, and enrollment disputes in Ohio.  According to the article, "The PUCO received 373 complaints about high billing, misleading and deceptive practices, and enrollment disputes regarding PALMco between Dec. 1[, 2018] and Monday [April 15, 2019]."[16]

33.    Similarly, here, PALMco has deceived Massachusetts residents into enrolling in expensive contracts for electricity.  This class action seeks to recover for Massachusetts residents the amounts above and beyond reasonable market rates that PALMco deceived Plaintiffs and the Class into paying as a result of the bait and switch scheme.

---

[13] *See* https://www.courant.com/politics/hc-news-palmco-fine-20170817-story.html, last viewed April 24, 2019

[14] *See* http://www.illinoisattorneygeneral.gov/pressroom/2017_03/20170309.html, last viewed April 24, 2019

[15] *Id.*

[16] *See* https://www.dispatch.com/business/20190417/puco-launches-investigations-against-palmco-and-verde-energy-over-sales-tactics, last viewed April 24, 2019.

### C.    Plaintiff's Experience with PALMco's Excessive Rates

34.     PALMco engages in a classic bait and switch pricing scheme.  PALMco lures consumers into switching to its electricity supply service by offering teaser rates that are much lower than its regular rates, while leading consumers to believe that the subsequent rates will be less than those offered by their Distribution Company and other CESs in the market.

35.     Plaintiff's experience with PALMco is typical.   In July 2015, Plaintiff was solicited by PALMco to switch her electricity service from her Distribution Company, Eversource, with the promises that she would save money on her electricity bills if she switched. Based on these promises, Plaintiff made the switch shortly thereafter.

36.     Furthermore, Plaintiff was provided with a solicitation in the form of a standard "Terms of Service," (the "Agreement") attached hereto as Exhibit "A."  PALMco's Agreement makes this express link between its Variable Rate and the underlying wholesale market rate set by ISO New England and charged by Generation Companies, stating that the customer will pay a variable rate that "***will*** vary from month to month based on a monthly zonal locational marginal price determined on a day ahead or real time basis, any supply and agency functions that PALMco performs for you, line loss, compliance costs, certain transmission, capacity, ancillary, and administrative costs incurred by PALMco, and other prevailing market conditions." (emphasis added)."

37.     As such, reasonable consumers including Plaintiff believe that PALMco promises its Variable Rate that will change in a manner correlated with the underlying wholesale market rate, and that, although prices would go up when wholesale prices rose, they would also go down when wholesale prices decreased, enabling consumers to take advantage of market lows.

38.     Instead, and contrary to reasonable consumer expectations and the terms of PALMco's Agreement, PALMco used its Variable Rates as a pure profit center, increasing the rates charged to Plaintiff and class members when wholesale prices rose, but staying at a level almost **three times** the wholesale market rates when the wholesale prices fell.

39.     Based on these representations, any reasonable consumer would understand that PALMco's Variable Rate would reflect PALMco's cost for purchasing electricity at wholesale, and that the Variable Rate would be competitive with the rates offered by PALMco's competitors -- the Distribution Company and other CESs in the market.

40.     Based on PALMco's representations, Plaintiff decided to switch to PALMco for electricity in July 2015.  Plaintiff was initially placed on PALMco's introductory rate for her first two billing cycles at 7.1150 cents per kWh.

41.     In September 2015, Plaintiff was switched over to PALMco's variable rate plan. Plaintiff paid PALMco's variable rate until January 2019 when she cancelled service with PALMco and returned to Eversource.  During the time Plaintiff was on PALMco's variable plan, rather than providing Variable electric rates that were tied to wholesale market conditions, PALMco charged Plaintiff exorbitant monthly rates that were not based on wholesale market conditions and far higher than competitors' rates.

42.     During the time Plaintiff was on PALMco's electricity plan, she was overcharged thousands of dollars.

43.     PALMco's breach of its promises and affirmations caused injury to Plaintiff because she believed that by switching to PALMco's electricity plan, she was contracting for a competitive rate that was tied to the wholesale market rate.

44.    Plaintiff overpaid for electricity based on PALMco's improper practices.  She would not have enrolled in PALMco's plan but for its false representations.  Had Plaintiff known that PALMco's rates would be significantly higher than the wholesale market rate or that PALMco would not provide her with a competitive electric rate, she would not have made the decision to switch from Eversource and enroll in PALMco's plan.

45.    The chart below sets forth (1) the average wholesale price (in cents per kilowatt hour) of electricity delivered to Massachusetts for months during the period Plaintiff was enrolled in PALMco's Variable Rate plan, as reported by ISO-New England; (2) the non-promotional Variable Rates PALMco charged Plaintiff for those same months as represented by PALMco; and (3) the resulting percentage premium that PALMco charged consumers compared to the wholesale rate on a per-month basis:

| Billing Period[17] | Average Wholesale Price[18] | PALMco Price | PALMco Premium ABOVE Wholesale Price |
|---|---|---|---|
| Service End Date | $/kWh | $/kWh | % |
| 10/10/2018 | $0.0670 | $0.17160 | 156% |
| 5/10/2018 | $0.0348 | $0.18590 | 434% |
| 5/6/2016 | $0.0372 | $0.20620 | 455% |
| 4/19/2016 | $0.0499 | $0.19428 | 290% |
| 3/18/2016 | $0.0363 | $0.19428 | 435% |
| 2/17/2016 | $0.0523 | $0.19928 | 281% |

46.    There was, accordingly, a huge disparity between the wholesale rates PALMco paid for power and the Variable rates that it charged its customers, including Plaintiff and Class Members.

---

[17] The first day of the period is approximately thirty days before.

[18] The Average Wholesale Price is compromised of the ISO-NE Total (which includes the ISO-NE NEMA LMP plus other wholesale charges).  Plaintiff moved from West Newton, MA to Dedham, MA while with PALMco, which fall in the Northeastern MA (NEMA) Zone.  *See* https://www.iso-ne.com/about/key-stats/maps-and-diagrams/.

47.    Accordingly, PALMco routinely charges Plaintiff and Class Members a Variable Rate for electricity that is at times as much as ***five times higher*** than the underlying market rate.

48.    For example, as shown in the chart above, in February 2016, the average wholesale price was $0.0523 per kilowatt hour but PALMco charged $0.19928 per kilowatt hour, a premium of 281% on top of the wholesale price. The following month, March 2016, the average wholesale price was $0.0363 per kWh, but PALMco's price was $0.19428 per kilowatt hour, rising to a premium of 435% on top of the wholesale price, which is surprisingly close to six times the wholesale rate.

49.    The monthly zonal locational marginal price on which PALMco bases its Variable Rates encompasses the bulk of the wholesale price.  It is the $/MWH (the cost of energy) in the wholesale market during the relevant time.

50.    PALMco's other costs, other than its wholesale cost of power, were relatively fixed and could not have justified the massive increases alleged above.  For example, charges as ancillary and capacity charges and other regulatory costs did not fluctuate to any material extent and, in particular, did not fluctuate to a material extent in relation to wholesale power prices (these additional costs are included in the "average wholesale price" in the chart shown in paragraph 47 above).  PALMco's other material costs were for operations, and included costs, for example, relating to rent, equipment, overhead, employees, etc. were also relatively fixed and could not justify the price variations alleged above.

51.    PALMco's representation to consumers concerning its Variable pricing plan — that the Variable rate is market-based— is patently false.  Although PALMco *increases* its Variable rate in response to *rising* wholesale prices, PALMco fails to *decrease* its prices in response to a *falling* wholesale market price.  Oftentimes, PALMco's rate rises even when the

wholesale market rate decreases, and PALMco's rates consistently remain significantly higher than the local competitors and the wholesale market rate. For example, the average wholesale price dropped from $0.0499 in April 2016 to $0.0372 in May 2016. However, during the same time period, PALMco's rate increased from $0.19428 to $0.20620, landing at a premium of **455%** on top of the wholesale price.

52.     Notably, PALMco charges these exorbitant premiums without adding any value to the consumer whatsoever. As detailed above, PALMco neither produces nor transports electricity. It has no role in running or maintaining power plants or power lines; it does not perform hookups or emergency responses. Indeed, PALMco does not even handle customer billing: that, too, is handled by the Distribution Company. Essentially, all that PALMco does is act as a trader in the transaction. Yet it charges multiple times the amount that the Generation Companies receive for making electricity and that the Distribution Companies receive for transmitting power, maintaining power lines, handling emergency services, and customer billing and calls.

53.     The following chart compares PALMco's rates to Eversource's rates, which is Plaintiff's Distribution Company. The chart demonstrates that PALMco did not provide Plaintiff with a rate based on market conditions—which it promised to Plaintiff and other consumers.

| Billing Period[19] | PALMco Rate | Eversource Rate[20] | Difference ABOVE Eversource Rate |
|---|---|---|---|
| Service End Date | $/kWh | $/kWh | % |
| 10/10/2018 | $0.17160 | $0.12008 | 43% |
| 5/10/2018 | $0.18590 | $0.11172 | 66% |
| 5/6/2016 | $0.20620 | $0.07381 | 179% |

[19] The first day of the period is approximately thirty days before.
[20] This is the Eversource Price to Compare, which can be found here: https://www.mass.gov/service-details/basic-service-information-and-rates. This is the electricity rate that Plaintiff would have paid had she remained with Eversource and not switched over to PALMco's electricity plan.

| 4/19/2016 | $0.19428 | $0.08306 | 134% |
|-----------|----------|----------|------|
| 3/18/2016 | $0.19428 | $0.10383 | 87% |
| 2/17/2016 | $0.19928 | $0.14176 | 41% |

54.     Looking at the chart above, from April 2016 to May 2016, Eversource's rate decreased from $0.08306 to $0.07381, whereas PALMco's rate *rose* from $0.19428 to $0.20620 in those same months, resulting in a 179% overcharge.

55.     As set forth above, PALMco breached its customer contracts as its consumers do not receive a price based on market conditions.  Instead, consumers are charged rates that are substantially higher those of competitors and untethered to market conditions. PALMco intentionally fails to disclose this material fact to its customers because no reasonable consumer—including Plaintiff Melissa Davis—who knows the truth about PALMco's exorbitant rates would choose PALMco as an electric supplier.

56.     Defendant PALMco's statements and omissions regarding its electricity rates are materially misleading, as the most important consideration for any reasonable consumer when choosing an energy supplier is price.  No reasonable consumer, including Plaintiff, who knew the truth about PALMco's exorbitant rates would choose PALMco as an electric supplier, and no reasonable consumer, including Plaintiff, could be expected to uncover the truth until after they have paid PALMco's exorbitant rates and had the opportunity to compare them to other rates charged during the same time period and in the same location.

57.     Not surprisingly, PALMco's rates are not competitive with those of other CESs either. *See* Exhibit "B" (2016 Retail Power Marketers Sales – Residential, U.S. Energy Information Administration).  In fact, according to U.S. Energy Information Administration's data, in 2016, PALMco's rates were higher than ***100%*** of the 39 CESs providing residential

electricity services in Massachusetts.  *See* id.  In 2017, PALMco's rates were higher than **93%** of the 43 CESs providing residential electricity services in MA.  *See* 2017 Retail Power Marketers Sales – Residential, U.S. Energy Information Administration, http://bit.ly/2pgWXpO (last visited April 25, 2019).

58.    PALMco knowingly and intentionally made these misleading statements regarding its electric rates so that reasonable consumers like Plaintiff would be enticed by its false and misleading statements and switch their Electric Supplier and/or Generation Company to PALMco.

59.    PALMco's only product is electricity delivered by Distribution Companies and has the exact same qualities as electricity supplied by other CESs or Generation Companies. There is nothing to differentiate PALMco Energy from other CESs, Distribution Companies, or Generation Companies such that would warrant higher rates, and the potential for a price based on market conditions is the only reason Plaintiff and any reasonable consumer would enter into a contract for electricity with PALMco.

60.    PALMco knows full well that it charges a rate that is unconscionably high, and the misrepresentations it makes about its Variable Rates being market-based were made for the sole purpose of inducing consumers to sign up for PALMco's electricity supply.  PALMco reaps outrageous profits to the direct detriment of Massachusetts consumers without regard to the consequences high utility bills cause such consumers.  As such, PALMco's actions were actuated by actual malice or accompanied by wanton and willful disregard for consumers' well-being.

61.    PALMco's misstatements and omissions caused injury to Plaintiff because she believed that her rate would be based on market conditions when switching from Eversource to PALMco's electricity plan.  Plaintiff would not have enrolled in PALMco's plan but for its false

misrepresentations. Had Plaintiff known that the rates she would be charged by PALMco would be substantially higher than her local Distribution Company (and not based on market conditions), she would not have made the decision to switch. In fact, Plaintiff and class members substantially overpaid for electricity as a direct result of PALMco's misrepresentations, and therefore suffered common injuries, for which damages can be calculated.

62.     Had PALMco Energy charged Plaintiff a rate that was actually based on market conditions, Plaintiff would have been charged a substantially lower rate, and she was injured accordingly when she paid her inflated bill.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following class of similarly situated persons:

> All persons enrolled in a PALMco Energy Variable Rate plan in connection with a property located within Massachusetts at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of class certification (the "Class").

64.     Plaintiff reserves the right to modify or amend the definition of the proposed Class or to propose sub-classes as might be necessary or appropriate.

65.     Excluded from the Class are Defendants, including any parent, subsidiary, affiliate or person controlled by Defendants; Defendants' officers, directors, agents or employees; the judicial officers assigned to this litigation; and members of their staffs and immediate families.

66.     The proposed Class and meets all requirements for class certification. The Class satisfies the numerosity standard. The Class is believed to number in the tens of thousands of persons. As a result, joinder of all class members in a single action is impracticable. On

information and belief, class members can be identified by PALMco and Distribution Company records.

67.    There are questions of fact and law common to the Class which predominate over any questions affecting only individual members.  The questions of law and fact common to the Class arising from PALMco's actions include, without limitation, whether PALMco:

       a.   breached its contract with regard to its Variable Rate;

       b.   breached its covenant of good faith and fair dealing with regard to its Variable Rate contracts;

       c.   was unjustly enriched through its Variable Rate policies and practices; and

       d.   continues to commit wrongdoing through its Variable Rate policies and practices.

68.    The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness and equity to other available methods for the fair and efficient adjudication of this controversy.

69.    Plaintiff is an adequate representative of the Class because she is a member of the Class and her interests do not conflict with the interests of the members of the class she seeks to represent.  The interests of the members of the Class will be fairly and adequately protected by Plaintiff and her undersigned counsel, who have extensive experience prosecuting complex class action litigation.

70.    Plaintiff's claims are typical of the claims of the Class because they arise out of the same conduct, policies, and practices of PALMco with respect to its Variable Rate policies and practices.  Plaintiff has suffered the harm alleged and have no interests antagonistic to the interests of any other putative class member.

71.    Maintenance of this action as a class action is a fair and efficient method for the adjudication of this controversy.  It would be impracticable and undesirable for each class member who suffered harm to bring a separate action.  In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all class members.

72.    Notice can be provided to Class members by using techniques and forms of notice similar to those customarily used in other class actions.

## CLAIMS FOR RELIEF

## COUNT I

### BREACH OF CONTRACT
**(On Behalf of Plaintiff and the Class)**

73.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

74.    Plaintiff brings this Count on behalf of herself and the Class.

75.    Plaintiff and the Class entered into a valid contract with PALMco for the provision of electricity (the "Agreement").

76.    Pursuant to the Agreement, PALMco agreed to charge a Variable Rate for electricity that is based on "prevailing market conditions."

77.    Pursuant to the Agreement, Plaintiff and the Class paid the Variable rates charged by PALMco for electricity.

78.    However, PALMco failed to perform its obligations under the Agreement because it charged Variable Rates for electricity that were not market-based and instead significantly higher than the wholesale market rate for Electricity.

79.     Plaintiff and the Class were damaged as a result because they were billed and paid for, electricity rates that were substantially higher than they would have been had PALMco provided a market-based Variable Rate.

80.     By reason of the foregoing, PALMco is liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

## COUNT II
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (On Behalf of Plaintiff and the Class)

81.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

82.     Plaintiff brings this Count on behalf of herself and the Class.

83.     All contracts contain an implied covenant of good faith and fair dealing, including Plaintiff's and Class members' contracts with PALMco.

84.     PALMco's Terms of Service with customers gives PALMco discretion concerning the monthly rates charged under Variable rate contracts and any increases or decreases to the rate to reflect changes in the wholesale power market.

85.     As alleged herein, PALMco has used its discretion to bill exorbitant rates that are not tied to the wholesale market and to *increase* the monthly Variable Rate when wholesale market rate goes down.  PALMco's rates consistently remain significantly higher than local competitors' rates and the wholesale market rate. PALMco failed to disclose that, on a consistent and pre-programmed basis, its Variable Rates are substantially higher than the local competitors' rates and are exorbitant when compared to market rates.  As a result, consumers are billed exorbitant electric rates several times that of the wholesale market rate.

86.     PALMco's performance of its discretionary functions under the Terms of Service, as alleged herein to maximize its revenue from Variable Rates, impedes the right of Plaintiff and other Class Members to receive benefits that they reasonably expected to receive under the contract.

87.     On information and belief, PALMco's actions as alleged herein were performed in bad faith, in that the purpose behind the practices and policies alleged herein was to maximize PALMco's revenue at the expense of its customers and in contravention of their reasonable expectations as customers of PALMco.

88.     PALMco has breached the covenant of good faith and fair dealing in the Terms of Service through its Variable Rate policies and practices as alleged herein.

89.     Plaintiff and members of the putative Class have sustained damages as a result of PALMco's breaches as alleged herein.

## COUNT III

**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class,**
**In the Alternative to Count I)**

90.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

91.     If the Court finds no contract existed between Plaintiff and Defendants, Plaintiff brings this claim for unjust enrichment on behalf of herself and the Class.

92.     PALMco has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein to the detriment of Plaintiff and the Class.

93.     PALMco has been enriched by a benefit in the form of payment of exorbitant Variable Rates.

94.     PALMco's enrichment was at the expense of Plaintiff and the Class.

95.     It would be unjust to allow PALMco to retain the benefit.

96.     Plaintiff and the Class are entitled to disgorgement and restitution of all wrongfully-obtained gains received by PALMco as a result of its wrongful conduct alleged herein.

97.     Plaintiff and members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, requests that this Court enter judgment against PALMco and in favor of Plaintiff and award the following relief:

(a)    Certification of the proposed Class, appointment of the Plaintiff as Class representative, and designation of her attorneys as Class Counsel;

(b)    Injunctive relief enjoining PALMco from charging exorbitant Variable Rates under its current policies and from engaging in the wrongful, deceptive, unfair, and unconscionable practices alleged herein;

(c)    Damages in an amount to be determined at trial, including actual and punitive damages;

(d)    Disgorgement and restitution of all exorbitant rates paid to PALMco by Plaintiff and the putative Class as a result of the wrongs alleged herein;

(e)    Pre- and post- judgment interest at the maximum rate permitted by applicable law;

(f)    Attorneys' fees, costs, and expenses as available under the law;

(g)    Such other and additional relief as the Court may find just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action so triable.

Dated: April 25, 2019                    Respectfully Submitted By:

                                         **BLOCK & LEVITON LLP**

                                         /s/ Jeffrey C. Block
                                         Jeffrey C. Block
                                         Jason M. Leviton
                                         Nathaniel Silver
                                         260 Franklin Street, Suite 1860
                                         Boston, MA 02110
                                         T:  617-398-5600
                                         F:  617-5076020
                                         jeff@blockesq.com
                                         Jason@blockesq.com
                                         Nate@blockesq.com

                                         Jonathan Shub*
                                         Kevin Laukaitis*
                                         **KOHN, SWIFT & GRAF, P.C.**
                                         1600 Market Street, Suite 2500
                                         Philadelphia, PA  19103-7225
                                         T:  215-238-1700
                                         F:  215-238-1968
                                         jshub@kohnswift.com
                                         klaukaitis@kohnswift.com

                                         Daniel K. Bryson*
                                         Harper T. Segui*
                                         **Whitfield Bryson & Mason, LLP**
                                         900 W. Morgan Street
                                         Raleigh, NC 27603
                                         T: 919-600-5000
                                         dan@wbmllp.com
                                         harper@wbmllp.com

                                         Gregory F. Coleman*
                                         Lisa A. White*
                                         **GREG COLEMAN LAW PC**
                                         First Tennessee Plaza
                                         800 S. Gay Street. Suite 1100

Knoxville, TN 37929
T: (865) 247-0090
F: (865) 522-0049
greg@gregcolemanlaw.com
lisa@gregcolemanlaw.com

*Pro Hac Vice Application
Forthcoming

*Attorneys for Plaintiff and
the Class*